# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-18-00284-CV
---

**K. N. M., a/k/a K. H., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---
**FROM THE 345TH JUDICIAL DISTRICT COURT OF TRAVIS COUNTY,
NO. D-1-FM-16-006145, HONORABLE KARIN CRUMP, JUDGE PRESIDING**
---

## M E M O R A N D U M   O P I N I O N

Appellant K.N.M., a/k/a K.H., appeals the order on a jury's verdict terminating her parental rights to her minor child, S.H. The district court found as a matter of law that K.N.M.'s parental rights to an older child had been terminated, establishing under Section 16.001(b)(1)(M) that the Department of Family and Protective Services (the "Department") had proven by clear and convincing evidence the grounds for termination K.N.M.'s parental rights to S.H. Following a three-day jury trial, the jury unanimously determined that termination of K.N.M.'s parental rights was in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(1).

On appeal, K.N.M. claims that (1) the trial court erred in denying her motion for mistrial; and (2) the evidence is factually insufficient to support the jury's best-interest finding. We affirm the order of termination.

1

## Summary of the Evidence

At the time of the trial, the child, S.H., was twenty months old. Throughout the three-day trial, neither the biological mother, K.N.M., nor the biological father, C.H., appeared in court. The court heard testimony from several witnesses including S.H.'s foster mother, S.H.'s former occupational therapist, S.H.'s former caseworker, K.N.M.'s former counselor, and S.H.'s current conservatorship caseworker with the Department.

S.H.'s foster mother testified that S.H. suffered a brain injury at birth—hypoxic ischemic encephalopathy (HIE)—which left S.H. without oxygen, causing cerebral palsy. Grubb and her husband have cared for S.H. since she was released from the hospital following her birth. S.H.'s foster mother, who has been licensed as a foster parent for three to four years, is a pediatric nurse who works with medically disabled children. Her husband of more than ten years is a stay-at-home father to their five children—two biological, two adopted, and their foster child S.H.

S.H.'s foster mother testified in detail about S.H.'s life with cerebral palsy and the daily care she needs. The cerebral palsy causes S.H.'s brain to not "send her muscles the correct signals all the time," which makes mobility and feeding very difficult. At almost two years of age, S.H. cannot crawl, sit without assistance, or eat on her own. S.H. must be fed through a gastrostomy tube (G tube), which requires frequent cleaning and biannual appointments to ensure its correct fit and operation.

S.H.'s foster mother testified about planning and coordinating S.H.'s appointments with various doctors and therapists, including a neurologist who sees S.H. every three months and prescribes several medications; a gastroenterologist; a primary care physician; a G Tube surgeon, who sees S.H. once every six months; nurses; and therapists (occupational, speech, and physical)

2

who see S.H. weekly. S.H.'s foster mother explained that S.H. would be entitled to see the same medical professionals in K.N.M.'s home if returned to K.N.M. because the treatment is covered by Medicaid but that the planning, coordinating, and keeping up with forms is time consuming.

S.H.'s foster mother testified that she has never seen K.N.M. at a medical appointment for S.H. and that in the past six months, she has taken S.H. to an arranged visit with K.N.M. only one time. She further testified that she has gotten S.H. ready for visits with K N.M., but the visits failed to take place "numerous times." S.H.'s foster mother stated her husband took S.H. to an arranged visit with her father, C.H., only one time in January or February 2017. S.H.'s foster mother expressed concerns that K.N.M. is irresponsible because of the number of visits she has missed. S.H.'s foster mother stated that an ideal care-giver for S.H. needed to be responsible, organized, and sober.

Grubb testified that if the parental rights were terminated for K.N.M. and C.H., she "absolutely" planned to adopt S.H., knowing that S.H. may require special care her entire life. S.H.'s foster mother testified about the bond her family feels with S.H., the relationship between her other children and S.H., and the improvements S.H. has made since being in her care, including the ability to eat some solid foods, fewer reflux reactions and vomiting, increased mobility, increased eye contact, smiling, and increased muscle control.

Erika Mountz, S.H.'s former occupational therapist, testified about her care for S.H. Mountz worked with S.H. twice per week from the time she met S.H. until March 2018. Mountz worked with S.H.'s foster parents to set up the appointments and discussed S.H.'s foster parents' obligations regarding her services, including communicating with the home health agency, applying

for and proving the requirements necessary for Medicaid funding, ensuring S.H. received all necessary therapies. Mountz further testified that after she took a new job, S.H.'s foster parents had to find a new occupational therapist for [S.H.], and that if S.H. was to be placed into a different home or moved from S.H.'s foster parents, the new care-giver would have to take over all the responsibilities associated with ensuring S.H. received therapy appointments. Mountz stated that as long as someone continued to apply for Medicaid funding and apply for occupational therapy services, S.H.'s occupational therapy appointments could continue.

Mountz evaluated and treated S.H. and stated her goal was to help with S.H.'s mobility and muscle control. Mountz described S.H. as "motivated," "curious," and as "a fighter," and stated that S.H. suffered from separation anxiety. Mountz testified that S.H.'s future progress depended on a care-giver "following up with exercises and occupational therapy" and that if that is not done, S.H. would be at risk of muscle contractures, shortening of muscles (i.e., "not being able to move them in all directions"), decreased progression in eating, increased oral aversion, and an overall "decreased ability to learn how to move and interact with her environment and play, which then builds onto academic skill and other things that she'll need to build." Mountz stated that she would have concerns about S.H.'s physical well-being and quality of life if therapy was not continued. Mountz testified that she trusted the S.H.'s foster parents to provide a safe home and to take care of S.H.'s emotional, physical, and medical needs throughout her future if she was adopted by them. Mountz further testified that she has never met S.H.'s biological mother, K.N.M.

Rebecca Salam, S.H.'s former caseworker, testified regarding S.H.'s case. The Department took temporary custody of S.H. when it received an automated report upon S.H.'s birth

4

because K.N.M. had "previously had her parental rights terminated to an older child." Salam explained that "whenever a parent's rights are terminated based on the grounds of endangerment, the [D]epartment receives an automatic notification if they do have another child and [K.N.M.'s] rights were terminated because she endangered her child due to substance use of opiates and methamphetamines." Salam testified that the prior termination of K.N.M.'s older child was ordered just six months before S.H.'s birth. In addition to the prior termination alerting the Department, Salam noted that a "social worker indicated that S.H. was unable to eat on her own and that the hospital staff spoke with [C.H.] and [K.N.M.] about a [G Tube] and the family declined the procedure."

Salam testified that while K.N.M. did not test positive at the time that S.H. was born, the Department requested K.N.M. and C.H. take drug tests before the Department took custody of S.H. and also requested drug testing following the emergency conservatorship. She related that neither K.N.M. nor C.H. took any drug tests that were requested before the Department took custody of S.H. Salam also testified regarding a Status Hearing Order from a December 9, 2016 hearing, in which K.N.M. was not present, and stated that both parents were ordered to complete services at the hearing. She stated that the reason the court orders services "is that we can give parents and give families clear and identifiable services and goals that are attainable and measurable, so that they know what they need to do to get their child back, placed in their care." K.N.M. was ordered to submit to random drug screens within twenty-four hours of a request made by the Department, and while K.N.M. reported to the Department that she had done so, the drug-screen location "had no proof that she had attended." Salam testified that when the Department asked K.N.M. to go again,

5

she did not attend. Salam stated that during her entire time working on S.H.'s case, K.N.M. never attended a drug test that she requested.

Salam stated that she would be concerned for S.H.'s safety, especially given her "medically fragile" condition, if K.N.M. were to care for S.H. Salam based this on K.N.M.'s prior drug use, her failure to seek or participate in services for that use, and her failure to address her substance use. Salam testified that she was concerned about K.N.M. having a potential relapse and was concerned about potential current, ongoing use. In addition to drug use concerns, Salam explained that she did not advocate to send S.H. home to K.N.M. because of concerns regarding her home environment. She stated that "throughout the investigation, there were challenges with locating where K.N.M. was, whether or not her home address was truthful," and that S.H.'s condition comes with extensive needs which "require an extremely safe and structured and therapeutic environment." Salam stated that the Department had multiple addresses on file for K.N.M. during the ongoing investigation and that the Department received "conflicting information" from K.N.M.

Salam then testified about S.H.'s foster parents, stating that she observed a clean, organized home and that "it was very clear that [S.H.] had everything that she would need." She related S.H.'s foster parents "had all of her medical documentation" and "ensured that she had been to every appointment that she had needed," that they had been working to schedule occupational and speech therapy, and that they were trying to arrange twice weekly visits between S.H. and K.N.M. to ensure contact. She explained that the S.H.'s foster parents "did all the work" to get S.H. discharged home from the hospital and that the S.H.'s foster parents did not rely on Salam to set up appointments. Salam testified about why it would be detrimental to S.H. to have the State of Texas

6

be named her permanent conservator, including the risk of being moved around in foster care until she reaches the age of eighteen, and stated that for the S.H.'s foster parents to legally adopt S.H., the parental rights of both parents needed to be terminated.

Greg Couger, a licensed professional counselor, testified that he provided parenting curriculum and counseling to K.N.M. beginning in February 2017 and continued through May 2017. He was supposed to meet with K.N.M. for approximately one hour per week. Couger stated that he met with K.N.M. mostly in the La Grange CPS office, but that he "began meeting with her at different locations just to make [himself] available to her needs," including meeting her at the Bastrop and Giddings CPS offices. Couger testified that K.N.M. frequently cancelled appointments late, sometimes "as late as five minutes before the appointment," and sometimes failed to show up altogether. Couger related that K.N.M. completed nine of the ten "modules" in the parenting classes. Couger also stated that he sometimes met with K.N.M. in two-hour therapy appointments to make up time from prior missed appointments.

During his time as K. N. M.'s counselor, Couger testified that K.N.M. never complied with the requirement that she meet with him four times per month, that it was normal for her to "no-show" or cancel last minute, and that K.N.M. attended twelve sessions and cancelled twelve sessions from February 2017 to May 2017. He further explained that in one of the sessions that K.N.M. did attend, Couger spoke to her about the importance of consistency, predictability, and routines as one of the foundations of parenting because unpredictability "creates a lot of stress and chaos in [childrens'] lives" and that parents can work to minimize or mitigate the stress and chaos by maintaining structured routines. Couger testified that by June 2017, the number of appointments that

K.N.M. had missed was "overwhelming" for him and he could not "sustain keeping her on [his] caseload if she was not going to . . . make a consistent effort to make those appointments." He related that he spoke to the Department caseworker about the problem, and that they developed a plan with K.N.M. to help her make appointments, that the plan was unsuccessful, and thus, K.N.M. was discharged from Couger's services.

Couger testified that he spoke with K.N.M. about her drug use at the direction of caseworker Amanda Whisenhunt, that they discussed the importance of not using drugs when caring for children, and that in his opinion, K.N.M. took an "avoidant response" regarding the drug use, avoiding "accountability" and "responsibility" for her actions. He testified that K.N.M. acknowledged she used in January 2017 and that she had a drug issue before giving birth to S.H. He also testified that K.N.M. expressed concerns about living in La Grange while the case was held in Austin, that she expressed frustration about not being able to see S.H. on a more regular basis, and that she expressed feelings of sorrow that the relationship was becoming more difficult to bond. He testified that he did not see K.N.M. in the courtroom that day.

Amanda Whisenhunt, S.H.'s current conservatorship caseworker with the Department, testified primarily about K.N.M.'s progress completing court-ordered services. Whisenhunt testified that when she first received S.H.'s case, she set up several services for K.N.M., including requesting that K.N.M. perform the following: provide safe and stable housing; show proof of employment; submit to random drug testing; complete an OSAR evaluation and follow all recommendations; honestly complete a psychological evaluation and follow all recommendations; complete individual therapy; attend S.H.'s medical appointments; demonstrate an understanding of

S.H.'s medical needs; and undergo training on using medical equipment and dispensing of medications. Of the services requested of K.N.M., Whisenhunt testified that K.N.M. failed to demonstrate that she secured safe and stable housing for S.H., to show proof of employment, and to comply with a court order for drug testing. Whisenhunt testified that it was her understanding that the last time K.N.M. had been drug tested was one year before the day of the trial. Whisenhunt's testimony regarding K.N.M.'s failure to comply with the drug testing can be summarized as follows: hair-strand test positive for amphetamines and methamphetamines in January 2017 (urinalysis test negative); rejected specimen in March 2017; negative urinalysis in April 2017; multiple failures to complete requests for random drug testing; failure to complete drug and alcohol assessment and to follow all recommendations. Whisenhunt related that K.N.M. failed to honestly complete a psychological evaluation and follow all recommendations and failed to comply with the request for follow-up evaluation. Whisenhunt also stated that K.N.M. failed to complete individual therapy. Whisenhunt explained that K.N.M. made it to only two of S.H.'s multiple medical appointments; failed to demonstrate an understanding of S.H.'s medical needs, and failed to complete a training on using medical equipment and dispensing of medications.

Whisenhunt testified that S.H.'s biological father, C.H., had informed Whisenhunt that "he did not want to participate and he would like to relinquish his rights and he did not want to be involved in the case or participate as [S.H.'s] father." Whisenhunt recommended C.H. for the same services provided as K.N.M. and explained that C.H. did not comply with any of them. Whisenhunt also related that C.H. expressed concerns to her about K.N.M. raising S.H., including that C.H. informed her that "he was concerned that [K.N.M.] was continually using illegal

substances throughout the entirety of the case." Specifically, Whisenhunt testified that C.H. informed Whisenhunt that K.N.M. was using heroin "after [she gave birth] but throughout this case."

Whisenhunt explained that K.N.M. was permitted to attend visitations with S.H. twice per week at a CPS office but often did not attend the visits. Whisenhunt related that K.N.M. would often "confirm and then not show up . . . [s]ometimes she would confirm and then cancel last minute, either due to . . . transportation, and sometimes sickness." Whisenhunt testified that the Department offered to arrange transportation for K.N.M. to and from the scheduled visits, but K.N.M. did not use those services. Whisenhunt stated that it was very difficult on the S.H.'s foster parents, given S.H.'s medical condition, to get S.H. ready and transport her to the visits twice weekly when K.N.M. failed to arrive timely. Whisenhunt stated that K.N.M. so frequently missed scheduled visits with S.H. that a court order was issued requiring K.N.M. to "arrive for the visits one hour before the visit starts and be in the lobby and signed in an hour prior to the visits" to avoid the difficulties of transporting S.H. to the visit, given her medical condition.

Whisenhunt stated that although K.N.M. had the opportunity to visit S.H. twice per week, there were some months where K.N.M. did not see S.H. at all, and that in every month, K.N.M. frequently missed multiple visits. Whisenhunt testified that she observed that during the visits with S.H. that did occur, K.N.M. was typically "very appropriate with her," but that on a few occasions, S.H. napped during the visits. Whisenhunt related that "[t]here were a couple times [K. N. M.] did start to nod off like to fall asleep, herself, but . . . she caught herself and I would remind her to stay awake."

Whisenhunt testified about the initial permanency plan for [S.H.'s] case, which was

10

family reunification. She stated that "around the second permanency hearing or third . . . we did switch our primary goal to unrelated adoption instead of family reunification, but family reunification remained as a backup goal." Whisenhunt stated the reasoning for the change to unrelated adoption as the primary plan was that "it became apparent that the parents were not engaged in services . . . they were having difficulty seeing any progress on their parts and [in] some cases, even contact, and we had to switch to unrelated adoption." Whisenhunt testified that the Department has one year to achieve permanent placement for the child but that in "extraordinary" cases, an extension can be granted. In this case, Whisenhunt testified that the biological parents had eighteen months to complete their services and "work towards getting [S.H.] back in their home." Whisenhunt also explained that after the primary plan became unrelated adoption, the Department "still kept family reunification as a second [plan]." She stated that "in the event the parents do decide to engage and participate, we want them to have every opportunity, so even though it might not be plan A, at some point, it's still always considered a plan B."

Whisenhunt also testified that the Department considered two possible relative placements for S.H.: The first possible relative placement had prior temporary placement of K.N.M.'s older child when K.N.M.'s rights were terminated to that child, but the relative placement was "identified as not protective," and so "was not an option for placement" for S.H. The second possible relative placement "declined to be a placement" for S.H. Further, Whisenhunt testified that the family who adopted K.N.M.'s older child was explored as a possible placement for S.H., but "[t]hey were not interested in being a placement for [S.H.]" and "didn't feel comfortable taking in a medically-fragile child at that time."

11

Whisenhunt testified that in her opinion, it was S.H.'s best interest to sever the relationship between S.H. and K.N.M. "due to her age and her medical status." She explained that S.H. is "medically fragile and completely dependent upon an adult or a responsible adult to make sure that all of her needs are met. Even something as simple as eating, she needs to be in an environment that is stable, that has consistency and routine because it's vital to her survival." Whisenhunt further testified that she believed S.H.'s needs were currently being met in her placement with the S.H.'s foster parents, that she would not trust that S.H.'s "needs would be met if she went to live with [K.N.M.]" or C.H., and that neither biological parent has "demonstrated the ability to parent a child." Whisenhunt confirmed that she did not see K.N.M. in the courtroom on that day of the trial.

Following the trial, the jury found that termination of K.N.M.'s parental rights was in the child's best interest, and the trial court terminated K.N.M.'s parental rights.

## Discussion

On appeal, K.N.M. argues that the trial court should have granted K.N.M.'s motion for mistrial, and that the evidence is factually insufficient to support the jury's best-interest finding.

### Mistrial

In her first issue, K.N.M. argues that the trial court erred in denying her motion for a mistrial. K.N.M.'s complaint is based on a question posed by the district attorney during voir dire of the potential jurors. The question at issue improperly suggested, according to K.N.M., that the Department had already met its burden of proof and that the burden had shifted to K.N.M. to prove why parental rights should not be terminated.

12

We review a trial court's ruling on a motion for mistrial for abuse of discretion. *S.A., Jr. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00790-CV, 2018 WL 1096012, at *2 (Tex. App.—Austin Mar. 1, 2018, no pet.) (mem. op.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Even if we assume without deciding, as the parties and the trial court have done, that the voir dire question did in fact suggest an improper burden of proof,[1] we cannot on this record conclude that the trial court abused its discretion in denying the motion for mistrial. The record indicates that during pre-trial proceedings the trial took efforts to cure any improper statement by reading to the jurors the portion of the agreed charge that defined "clear and convincing" and that specified that the Department had the burden of proving by clear and convincing evidence that the parent-child relationship between the mother and the father should both be terminated. The trial court also noted that it had informed the panel on four separate occasions that nothing said by the attorneys during the voir dire examination is evidence. The trial court further explained that it had polled the jury panel to confirm that each potential juror understood that the Department had the burden of proof in this case, that nothing said during voir dire was in evidence, and that the Department still had to prove by clear and convincing evidence that the termination was in the best interest of the child. Finally, the trial court noted on the record that the final jury panel did not include any of the potential jurors who had expressed some confusion regarding the burden of proof.

---

[1] Because the parties waived a record of the voir dire proceedings, there is no transcript on appeal. However, the parties and the trial court agree elsewhere in the record about the events that took place during voir dire.

We note additionally that the record shows that on the first day of trial the Department told the jury panel during its opening statement that the Department had "the burden to prove to you that termination of the parental rights of [K.N.M.] and [C.H.] is in the best interest of [S.H.]." The Department further explained that termination is a "two-prong test" where "the petitioner has to prove a ground for termination and has to also prove that it's in the best interest of [S.H.]," and that in this case, "a Judge has already ordered that [the Department] ha[s] proven the ground by clear and convincing evidence" and is in trial now to solely prove best interest.

On this record, we cannot conclude that the trial court abused its discretion in denying K. N. M.'s motion for mistrial. Accordingly, we overrule K.N.M.'s first issue.

**Factual sufficiency**

In her second issue, K.N.M. challenges the factual sufficiency of the evidence supporting the jury's best-interest finding.[2] We evaluate the factual sufficiency of the evidence by reviewing the entire record, and we uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction that the allegation was true. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). We do not weigh witness credibility issues that depend on appearance and demeanor, and when credibility issues are reflected in the record, we must defer to

---

[2] In a proceeding to terminate the parent-child relationship, the petitioner must establish by clear and convincing evidence a predicate violation—i.e., that the parent's acts or omissions constitute a statutory ground for termination—and that termination of parental rights is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Here, K.N.M. challenges only the court's finding that termination was in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

14

the factfinder's determinations if they are not unreasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In determining whether termination of parental rights was in the child's best interest, we may consider a non-exhaustive list of factors including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent indicating that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see* Tex. Fam. Code § 263.307 (noting that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and setting forth factors to consider in evaluating parent's willingness and ability to provide child with safe environment). Proof of all these factors is not a prerequisite to termination of parental rights, and the absence of some factors does not preclude the court from finding by clear and convincing evidence that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence that proves one or more of the statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *Id.* at 28.

Under these factors, we find the evidence was sufficient for the jury to form a firm conviction that termination of K.N.M.'s parental rights was in the best interest of S.H.:

**1. Child's emotional and physical needs and emotional and physical danger**

S.H.s' emotional and physical needs, both now and in the future, are greater than the average child's, as her medical condition, cerebral palsy, renders her completely dependent upon the care of others and could render her completely dependent for the remainder of her life. As to the emotional and physical needs of S.H. and any emotional or physical danger to S.H., evidence shows that K.N.M. failed to show she could provide a stable home for S.H., failed to provide proof of employment, failed to attend monthly visitations with S.H., failed to attend S.H.'s medical appointments, failed to complete drug tests required to visit S.H., failed to complete court mandated therapy and parenting class appointments, and failed to complete other court ordered services. There was evidence that K.N.M. may have ongoing substance-abuse problems, including with opiates and methamphetamines. K.N.M.'s parental rights to another child were previously terminated several months before S.H. was born due to her substance abuse. Further, evidence shows that S.H.'s medical condition requires great care, as she sometimes asphyxiates in her sleep, vomits, and cannot sit up, crawl, or eat without assistance. K.N.M. was notably absent during the duration of the trial. Further, the evidence established that the S.H.'s foster family is able to provide for S.H.'s emotional and physical needs, along with her challenging medical needs.

**2. Parenting ability of individual seeking custody and stability of the home**

As to the parental abilities of the individual seeking custody and the stability of the home or proposed placement, evidence shows that K.N.M. failed to demonstrate an ability to parent S.H. and failed to provide a stable home for S.H. The Department was never provided with an accurate address for K.N.M. K.N.M. failed to visit S.H. and failed to take S.H. to her medical

16

appointments. C.H., who wished to relinquish his parents rights to S.H., told witnesses that K.N.M. consistently used heroin. Several witnesses expressed concern in K.N.M.'s ability to parent and testified that they would be worried about S.H.'s safety and well-being if S.H. were placed back into the care of K.N.M. Evidence showed K.N.M. lacked an ability to arrive at scheduled visitations and appointments. Evidence showed that S.H. requires more care than the typical child, as she relies on a multitude of doctors and other care-providers, and is dependent upon a responsible adult to schedule those appointments and transport her to them. K.N.M. was absent during the duration of the trial over her parental rights, and her whereabouts were unknown to her attorneys.

### 3. Programs available to assist K.N.M. to promote the best interest of the child

As to the programs available to assist K.N.M. to promote the best interest of S.H., evidence shows that both K.N.M. and C.H. failed to complete court ordered services implemented to ensure their reunification with S.H. and failed to participate in programs that would assist them in promoting S.H.'s best interest. Specifically, K.N.M. failed to provide safe and stable housing, show proof of employment, submit to random drug testing, complete an OSAR evaluation and follow all recommendations, honestly complete a psychological evaluation and follow all recommendations, complete individual therapy, attend S.H.'s medical appointments, demonstrate an understanding of S.H.'s medical needs, and complete a training on using medical equipment and dispensing of medications. The Department offered additional assistance to K.N.M. by offering to arrange transportation to and from visitations with S.H., but K.N.M. did not use the service. The case was also granted an extension, giving K.N.M. eighteen total months to complete the services and programs needed to promote S.H.'s best interest, but K.N.M. still failed to complete the

17

available programs.

### 4. Plans for child by those individuals seeking custody

Evidence shows that the S.H.'s foster family intends to adopt S.H. and provide physical, emotional, and medical care for her throughout the remainder of her lifetime. Evidence shows the S.H.'s parents are committed to improving S.H.'s medical condition and quality of life. S.H.'s foster parents coordinate the many therapies necessary for S.H.'s continued improvement and participate in exercises outside of therapy to help S.H.'s condition improve. K.N.M. articulated no plans for the future for the child and did not appear at trial to testify on her own behalf.

### 5. Parent's acts or omissions indicating parent-child relationship is not proper

As to the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, K.N.M. has failed to comply with all court-ordered services required to gain custody of S.H., including failing to complete the court-ordered drug testing necessary to attend visitation with S.H. Each of the five witnesses who testified at the trial expressed concerns indicating the parent-child relationship between K.N.M. and S.H. is not proper.

Viewing the evidence in the light most favorable to the court's findings and assuming that the court resolved any disputed facts in favor of its findings, we conclude that the trial court could have formed a firm belief or conviction that termination of K.N.M.'s parental rights was in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2). Further, considering the entire record, we conclude that any disputed evidence could have been reconciled in favor of the court's findings, such that the court could have formed a firm belief or conviction that termination of K.N.M.'s parental rights was in the child's best interest. Thus, the evidence in this record is factually sufficient

18

to support the court's best-interest finding under section 161.001(b)(2) of the Family Code. We overrule K.N.M.'s second issue.

## Conclusion

Having overruled K.N.M.'s issues, we affirm the trial court's order terminating her parental rights.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Field

Affirmed

Filed:   August 28, 2018